# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH CARDENAS and MACHELLE CARDENAS, individuals; and EL PASEO GRANDE, LLC, an Arizona limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>ROBERTSON WHITTEMORE, individually and as trustee of the SUZANNE WHITTEMORE MARTIAL TRUST U/D/T/, DATED APRIL 27, 1995, as trustee of the SUZANNE WHITTEMORE BYPASS TRUST U/D/T, DATE APRIL 27, 1995, and as trustee of the ROBERTSON WHITTEMORE LIVING TRUST, DATED APRIL 27, 1995, and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. 10cv1808-LAB-KSC<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW;**<br><br>**ORDER DENYING AS MOOT MOTION TO AMEND COMPLAINT; AND**<br><br>**ORDER OF JUDGMENT** |

This case was tried to the Court without a jury. After all the evidence was presented and argument heard from both sides, the Court delivered its verdict from the bench. At that time, the Court explained that the oral verdict was a summary, and would be supplemented by a written decision setting forth the Court's findings of fact and conclusions of law. The Court now does so.

This case was originally assigned to Judge Thomas J. Whelan, but was reassigned to Judge Larry A. Burns after Judge Whelan's recusal. As explained at trial, the Court saw no reason to revisit Judge Whelan's earlier rulings, which are law of the case. The Court went beyond this, mentioning its agreement with Judge Whelan's determination. The Court is sitting in diversity, and applies California substantive law.

**Background and Claims**

Joseph and Machelle Cardenas, and Robertson Whittemore own residential property in La Jolla, California. Their lots are adjacent and enjoy an ocean view. Together with three other lots, they form the Ocean Front Terrace subdivision. Beginning in 1950, the subdivision was subject to a recorded Declaration of Restrictions created and recorded by Alice Ewing, who owned the land out of which the subdivision was created. The Declaration's terms provided that the restrictions could not be cancelled for approximately 40 years. But after that time, and in the future, they could be cancelled if owners of a majority of the lots agreed to do so and followed a prescribed procedure.

The former owner of the Cardenas' house, Warner Lusardi, testified, as did the Cardenas' and Whittemore's neighbor Richard Sulpizio, that they and a third neighbor signed a termination of restrictions in 2005. They knew at the time Whittemore was interested in adding rather than eliminating restrictions, so they did not ask him to participate in their discussions about the termination. The termination was recorded on May 10, 2005.

Whittemore's primary interest in restrictions concerned lateral views towards the ocean and beach. The Declaration concerned itself with views, but also other issues, including the appearance and design of the houses that could be built on the lots. The evidence showed that every house in the subdivision materially violated the restrictions, and at least one material violation (a flat garage roof on the property Whittemore now owns) began in the early 1950s. The restrictions called for an architectural jury before the construction of any house, but it was uncontested this requirement was never observed by any of the owners.

/ / /

**Declaratory Relief: Whether the Declaration of Restrictions Was Still in Force**

**Whether the Declaration Was Effectively Terminated**

The Declaration of Restrictions was admitted as Plaintiff's Exhibit U. In its entirety, the document is two pages long. It includes no provision for amending the restrictions. The only provision for making any change was the termination provision set forth in section V. That provision reads, in its entirety:

> That the foregoing restrictions and covenants shall terminate and be of no further force and effect after January 1, 1990, but will automatically be renewed thereafter for successive periods of ten years unless the owners of fifty-one per cent (51%) of the above described parcels of real property shall file a protest or relinquishment of restrictions in the Office of the County Recorder, within the year preceding the year 1989 or any other successive date, as provided herein.

Uncontested evidence showed that the owners of 60% of the parcels signed and filed a termination of the restrictions in 2005. The Court concludes this termination amounts to a "protest or relinquishment of restrictions" so, if it meets the provision's other requirements, it would have terminated the restrictions.

Because Judge Whelan ruled that this provision was ambiguous (a determination the Court agrees with), extrinsic evidence was received to shed light on the parties' intent. Because the Court is both the arbiter of law and the trier of fact here, it decides both the factual issue (what the ambiguous term means) and the legal issue, what the contract means. *See City of Santa Clara v. Watkins*, 984 F.2d 1008, 1012 (9th Cir. 1993) ("The interpretation of contracts under California law involves a complex interplay of questions of fact and questions of law.")

The continuation of the restrictions for the original 40-year period is unambiguous: they were to remain in place and to bind the property owners from the effective date in 1950 until January 1, 1990. If a majority of the ownership filed a termination "within the year preceding the year 1989," *i.e.*, during 1988, the restrictions would be of no effect after January 1, 1990. This created a one-year termination window (the year 1988), followed by a "dead" year (1989), and then by either termination on January 1, 1990 or by automatic renewal of the restrictions for a successive ten year period. When it comes to the later

termination windows, however, the language of this provision is ambiguous on its face. The term "any other successive date" can have at least three different meanings.

Whittemore's position is that "successive date" also refers to the one-year window for termination during later ten-year periods. If this is correct, the restrictions could only be terminated during the ninth year of a succeeding ten-year period, leaving the final, tenth year as a "dead" year. Under this analysis, termination was possible during 1988, 1998, and 2008 only—not during 2005 or any other year. This interpretation, he argues, is bolstered by the concluding phrase "as provided herein," because it suggests the date is identified in the document.

One weakness of this interpretation is that "date" is made to refer to an entire one-year period, which runs counter to the usual way in which this word would be used. *See Burnet v. Willingham Loan & Trust Co.*, 282 U.S. 437, 439 (1931) (holding that the word "date" in section 250(d) of the Revenue Acts of 1918 and 1921 plainly referred to the year and day of the month that the event occurred). A second weakness is why the tenth year is a "dead" year during every successive renewal period. Whittemore argues the "dead" year was provided to give notice to an objector who wished to challenge the termination or persuade fellow owners to rescind it. But the provision doesn't provide for a challenge, withdrawal, or rescission; if a majority of ownership decides to terminate the restrictions, there is nothing a minority owner can do.

A similar interpretation relies on "successive date" as referring to the renewal date. The first such date would be January 1, 1990; the second, January 1, 2000; and the third, January 1, 2010. This interpretation is also supported to some extent by the phrase "as provided herein," because the automatic renewal dates are provided for in the declaration. Under this interpretation, the termination could be filed in 1988, 1999 (*i.e.*, the year immediately preceding January 1, 2000), and 2009 (*i.e.*, the year immediately preceding January 1, 2010). This is more reasonable in that it relies on the usual meaning of "date." What remains unexplained is why the initial termination window falls in the penultimate year, while later windows shift to the final year.

A third interpretation is that "any other successive date" means the termination could be filed at any later date. This relies on "successive" meaning simply "following" or "later," (regardless of the interval) rather than "following periodically" or "following at set intervals." Nowadays it would be much more common for someone drafting a document simply to write something like "later," but "successive" in this sense was not uncommon in earlier times. *See, e.g., Edwards v. United States*, 312 U.S. 473, 475 (1941) ("[O]n April 14, 1938, and two successive dates, pursuant to subpoenas duces tecum, petitioner had appeared before an officer of the Securities and Exchange Commission. . . ."); *United States v. Morgan*, 313 U.S. 409, 423 n.1 (1941) (in dissent) (noting that since 1923, the position of Secretary of Agriculture was held by several different people "at successive dates"). "Successive" continues to be used in this sense, such as in the phrase "second or successive." *See, e.g., Martinez v. Ryan*, 132 S.Ct. 1309, 1320 2012) ("second or successive collateral proceedings"); *Carachuri-Rosendo v. Holder*, 130 S.Ct. 2577, 2583 (2010) ("second or successive misdemeanor conviction"; *United States v. Hayman*, 342 U.S. 205, 207 n.1 (1952) ("second or successive motion"). The term "succeeding" is also used in the Declaration in this same sense, in the "no waiver" clause, which is discussed below. Under this interpretation, the termination might be effective immediately, but in view of the "automatic renewal" language, it is more likely it would become effective only at the end of the ten-year period. For purposes of this case, the effective date of the termination makes no difference, because Plaintiffs' interest in having the restrictions lifted applies only prospectively.

Whittemore argues against this third interpretation, contending that the one-year "window" was intended to entrust the termination decision to those who owned the lots at the time of the termination. For example, if the termination could be signed and recorded at any time, a majority of the ownership in 2001 might terminate the restrictions effective January 1, 2010, even if a majority of later owners disagreed. While this is a possible reason, it isn't a very powerful one. With regard to the initial 40-year period, it would make more sense, because it was unlikely the original owners in 1950 would still own the property in 1990.

With regard to later ten-year periods, though, this argument is less compelling, because property of this type does not typically change hands as often, and when it does, the interests of the buyer and the seller are likely to be aligned. That's the case here, where the termination, although originally signed by owners of three of the five properties in 2005, continues to have at least three-fifths majority support. Only one of those properties has changed hands since 2005, and the new owners, Plaintiffs, agree with the previous owners' termination of the restrictions. In other words, a majority of the ownership from 2005 until the present has wanted the restrictions terminated.

Another problem with Whittemore's argument is that, even if there was some reason to prevent owners from cancelling the restrictions early in the ten-year period, they couldn't know when to file the termination. Because it is ambiguous whether the termination needs to be filed in the eighth or ninth year of the ten-year period, owners wouldn't know when to file it; and even if they attempted it, future buyers would have no assurance the termination was successful.

Based on the evidence presented, the Court finds this ambiguous provision was intended to provide for a 40-year initial term, followed by ten-year terms that would continue to be renewed until the filing of a termination. While the initial termination could only be filed in 1988, later terminations could be filed at any time during the ten year period, and would become effective at the end of the ten-year period.  Because a majority of the ownership filed a termination of restrictions in 2005, the Declaration of Restrictions is now terminated.

## Whether the Declaration of Restrictions Was Abandoned

The Court also holds that the contract doctrine of abandonment serves as an alternative basis for determining that the restrictions are no longer in force.

In the context of contracts, a contract may be terminated by its own terms, or "through the acts of the parties evidencing an abandonment." *Busch v. Globe Indus.*, 200 Cal. App.2d 315, 320 (Cal. App. 1962) (citing *Groves v. Superior Court*, 62 Cal. App.2d 559, 565 (Cal. App. 2 Dist. 1944)). "Abandonment of a contract is a matter of intent and is to be ascertained from the facts and circumstances surrounding the transactions out of which the

abandonment is claimed to have resulted. It may be implied from the acts of the parties." *Id.* (citing *Treadwell v. Nickel*, 194 Cal. 243, 259 (1924)). All the contracting parties must intend to disregard the contract before abandonment is established. *Amelco Electric v. City of Thousand Oaks*, 27 Cal.4th 228, 236 (2002). Another way to say it is that abandonment occurs where all contracting parties agree the contract is terminated and of no further force and effect. *Id.* (citing *Ben-Zvi v. Edmar Co.*, 40 Cal. App. 4th 468, 474 (1995)). Evidence of abandonment can include the parties' consistently disregarding its requirements. *Amelco* at 235–36 (citing examples).

In the property context, a declaration of restrictions can be abandoned. In *Harrison v. Frye*, 148 Cal. App. 2d 626, 626 (Cal. App. 1957), the defendants proffered evidence that (among other things) the restrictions were materially violated, the plaintiff had known about the violation for three to eight years, he didn't attempt to enforce them, he, himself, committed material violations, he told lot owners that restrictions were no longer effective, and "[t]here were so many material violations of the restrictions as to amount to a general disregard and abandonment of the restrictions." *Id.* at 629.

The Declaration of Restrictions here does include a "no waiver" clause: "No waiver of, or acquiescence in, any breach of any of the covenants, conditions or restrictions herein contained shall be construed as a waiver of or acquiescence in any condition or succeeding breach of the same or any other covenant, condition or restriction." Under this provision, one or more violations of the restrictions doesn't necessarily signal an intent to abandon the declaration. At the same time, the clause doesn't prevent the Declaration from being abandoned.

At trial, evidence was presented showing material violations of all five of the restrictions had been substantially ignored. At least two of them, the architectural jury provision and the prohibition on flat roofs, had been ignored virtually from the beginning. Section VI provides that breaches may be remedied by injunctive relief, and that violations will result in a forfeiture and reverter of the property to Alice Ewing, or her heirs and assigns. There was no indication that from the time the restrictions were imposed to the time the

termination was filed, injunctive relief had ever been sought or obtained. Nor was there any indication that any of the lots had ever reverted to Ms. Ewing, that she or her heirs or attempted re-entry onto any of the lots because of violations, or that any of the owners ever worried about their property being forfeited to Ms. Ewing or her heirs.

The only indication of reliance on any provision of the restrictions was evidence that Whittemore was concerned about the views, and cited the restrictions to neighbors on some occasions when he thought the views were being threatened by construction. He did not always do so, however, and he sometimes also raised complaints about things not covered by the restrictions. The Court finds it likely that Whittemore's complaints were aimed at the particular view obstructions he didn't like, and not any intent to keep the restrictions in place. The owners of the lots apparently responded to complaints about view obstruction and other matters out of a desire to be cooperative. After the termination was recorded, Whittemore cited the restrictions in a lawsuit he filed and then voluntarily withdrew.[1]

Whittemore argues that the restrictions, as they concern lateral views, were still observed. But the evidence adduced at trial showed lateral views had been partially blocked at times by obstructions that would have violated the restrictions, assuming the restrictions were in place. The various obstructions included walls, trees and other vegetation, a gazebo, trellises and similar structures, and overhanging second stories. In addition, the Declaration of Restrictions is not merely a view-protecting document; it is broader, addressing how the lots can be built on and used, and providing for enforcement mechanisms. Considering the large number of violations, some of which interfered with views and some of which violated other restrictions, and the lack of enforcement efforts, it does not appear anyone was

---

[1] There was testimony that Whittemore filed suit to prevent Mr. Lusardi, from whom Plaintiffs bought the house, from carrying out a renovation. (*See* Ex. Y (complaint).) But the complaint was filed in 2006, after the termination had been filed (although Whittemore didn't yet know about the filing). The complaint relies in part on the restrictions, and in part on other alleged obligations not included in the restrictions, such as limits on the style of home (the "cottage character"), the silhouette of the proposed building, Whittemore's "rights to sunlight and air," and Whittemore's "rights to privacy." (Ex. Y at 4:1–10.) None of these were ever secured by the restrictions. This casts some doubt on whether Whittemore knew or understood what the Declaration of Restrictions said. Whittemore testified that he withdraw the action because he thought it wouldn't be resolved quickly enough, and relying on other provisions of law would be more effective.

treating the Declaration of Restrictions as still being in force.  Taking the Declaration of Restrictions as a whole document, it had apparently been abandoned by all parties.

Accordingly, as an alternative basis for determining that the restrictions were successfully terminated, the Court finds they had been abandoned. While Plaintiffs raised other theories, the Court need not reach those issues.

**Trespass**

At trial, Plaintiffs' counsel conceded they were not bringing nuisance claims, only claims for trespass.  Trespass is an unlawful interference with the plaintiff's interest in the exclusive possession of real property, such as by unlawful entry on it. *Wilson v. Interlake Steel Co.* 32 Cal.3d 229, 233 (1982). Trespass can also be committed by placing something on the land. *Newhall Land & Farming Co. v. Superior Court*, 19 Cal.App.4th 334, 345 (Cal. App. 5 Dist. 1993) (citing Rest.2d Torts § 161).

Entry on land under the mistaken impression that there is consent or privilege to do so does not excuse the trespass and the tortfeasor is still liable (unless the possessor induced the mistake). *Cassinos v. Union Oil Co.*, 14 Cal. App.4th 1770, 1780 (Cal. App. 2 Dist. 1993) (citation omitted).  A trespass may occur if someone enters land pursuant to limited consent (*i.e.*, limited as to purpose or place) and exceeds those limits. *Id.*;*Mangini v. Aerojet-General Corp.*, 230 Cal. App. 3d 1125, 1141 (Cal. App. 3 Dist. 1991) (citing *Civic Western Corp. v. Zila Indus., Inc.* 66 Cal. App.3d 1, 17 (1977) and Rest.2d Torts § 168)).

Plaintiffs presented evidence of various intrusions or interference with the use of their land. Some of these pertain to light or noise, and therefore do not amount to trespass. *Wilson,* 32 Cal.3d at 282–83 (excessive noise or light intrusion may be nuisance, but is not trespass). The three credible instances of trespass involve a woman Whittemore allegedly allowed to practice yoga on Plaintiffs' lawn, Whittemore's party guests parking in Plaintiffs' driveway, and Whittemore's installing "story poles" with attached plastic tape in Plaintiffs' yard in preparation for a meeting about the proposed construction of Plaintiffs' deck.

Whittemore denied telling the woman she was free do her yoga workouts on Plaintiffs' lawn. The only evidence he might have said something like this was second-hand, and not

reliable. It's possible Whittemore never said anything to her and she merely claimed he did. It's also possible he said something to the effect that it was probably OK, but there was no evidence he knew her or sent her there. She may have been a trespasser, but on the evidence presented it doesn't follow that Whittemore was.

Ms. Cardenas' brother Ron Cinko testified that on one occasion, he and his mother went to dinner, and returned to find cars parked in Plaintiffs' driveway. Whittemore, Cinko said, told him he thought the family had gone and let his guests park there. Whittemore then offered to have the cars moved. Whittemore denied telling Cinko any of this, but the Court credits Cinko's testimony. Plaintiffs' house served as their vacation home; it was their practice to stay there only for limited periods, after which they would return to their home in Arizona. Under these circumstances, it is probable that Whittemore thought they were gone, and directed his guests to park there, believing it would make no difference to them. The Court finds that while this technically amounted to a trespass, this one incident in isolation was trivial and caused no harm. The Court therefore will not award damages for it.

Cinko also testified of a homeowners' meeting, where he saw some poles stuck into Plaintiffs' yard. The poles, he estimated, were ten feet high and about an inch in diameter. Another witness, Claude-Anthony Marengo, testified that this occurred at a meeting in December, 2009 with Whittemore, Plaintiffs' attorney, and an architect, Anthony Crisafi. When he arrived for the meeting, Whittemore had set up the poles and connected them with plastic tape. Marengo called these "story poles" and said they are often put in place to depict planned construction (in this case, a deck). Marengo said the first topic of conversation at the meeting was that the poles shouldn't have been installed. Both Marengo and Crisafi testified that they never knew of an instance when a person installed story poles in someone else's lawn without permission.

Whittemore admitted he installed the poles, but explained that he thought he wasn't doing anything against Plaintiffs' will, or that he was trespassing. As the authorities cited above show, however, a mistake about having the owner's consent (unless the owner induced the mistake) is not a defense to a trespassing claim. While circumstances show

Whittemore had permission to be in Plaintiffs' yard for purposes of attending the meeting, the scope of that permission did not include installing poles. Both Marengo's and Crisafi's testimony establishes that installing story poles is not a normal part of such meetings or discussions. The Court therefore finds this to be a trespass as well.

The only evidence establishing damages was Plaintiffs' own testimony concerning their stress and irritation, and testimony that it was more difficult to rent the house out. But the two instances of trespass do not appear to have caused any compensable monetary damage. Under some circumstances, sticking poles into a yard might cause harm, but it didn't do that here. Plaintiffs' emotional harm apparently arose mostly from Whittemore's non-tortious behavior, which clearly irritated them. Some of it may also have arisen from acts that might amount to nuisance, but nuisance was abandoned at trial as a theory of recovery.

Where, as here, no monetary damages have been established, the trier of fact may award nominal damages but need not do so. *Staples v. Hoefke*, 189 Cal. App. 3d 1397, 1406 Cal. App. 2 Dist. 1987) (citations omitted). The Court exercises its discretion and awards Plaintiffs $1.00 in nominal damages, solely for the incident involving installation of poles in Plaintiffs' yard.

**Injunctive Relief**

Having awarded nominal damages, the Court does not believe an injunction is necessary or appropriate. Whittemore's intrusions appear to have been nonmalicious and fairly isolated. With the award of nominal damages, he has had the proverbial shot fired across his bow. The Court's findings of trespass will make it difficult for him to argue that any future intrusions are innocent or the product of mistake. In light of the Court's findings and award, future trespasses or similar torts would seem more blameworthy and intentional, making it likely he would be to be subject to punitive damages. In the Court's view, this is enough of a deterrent to make an injunction unnecessary. *See Cisneros v. U.D. Registry, Inc.*, 39 Cal.App.4th 548, 574 (1995) ("A change in circumstances, rendering injunctive relief moot or unnecessary, justifies the denial of an injunction.")

/ / /

**Order of Judgment**

In light of the above determinations of fact and conclusions of law, the Court finds for Plaintiffs on both the claim for declaratory relief, and the claim for trespass.

The Court **DECLARES** the Termination of Restrictions filed at the San Diego County Recorder's office on May 10, 2005 as Doc # 2005-0394684 was effective in terminating the Declaration of Restrictions, and the Declaration of Restrictions recorded January 20, 1950 in the office of the County Recorder of San Diego County in Book 3464, beginning at page 214, is no longer in effect.

The Court **AWARDS** Plaintiffs $1.00 in nominal damages for trespass, against Mr. Whittemore individually. The request for injunctive relief is **DENIED** as unnecessary.

Plaintiffs may electronically submit a more specific proposed order if they wish using the Court's efile address, but they should cc opposing counsel and the proposed order should be in editable format. The Clerk is directed to enter judgment in favor of Plaintiffs and against Defendants, and to terminate the case.

**IT IS SO ORDERED**.

DATED: March 8, 2013

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge